UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------×
JONATHAN HOOKS,

        *Plaintiff,*                                    **18 CV 5177**

      *v.*

                                                    **COMPLAINT**

BRIDGESTREET GLOBAL HOSPITALITY,

        *Defendant.*
------------------------------------------------------------------------×

       Plaintiff Jonathan Hooks, by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendant BridgeStreet Global Hospitality ("BridgeStreet") as follows:

## PRELIMINARY STATEMENT

       1.      Mr. Hooks seeks damages and costs against BridgeStreet for subjecting him to a hostile work environment by discriminating against him based on his race (African-American) and sexual orientation, in violation of Section 1981 of the Civil Rights Act of 1866 ("§ 1981"), 42 U.S.C. § 1981, and the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code §§ 8-101 *et seq.*

       2.      Mr. Hooks also seeks damages and costs against BridgeStreet for retaliating against him for exercising his rights, in violation of § 1981 and the NYCHRL.

## JURISDICTION and VENUE

       3.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under § 1981.

       4.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's state and local statute claims, as these claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

5. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## TRIAL BY JURY

6. Plaintiff respectfully requests a trial before a jury.

## PARTIES

7. Plaintiff, at all times relevant hereto, was and is a resident of New York County in the State of New York.

8. Upon information and belief, at all times relevant hereto, Defendant was and is a privately held company organized under the laws of the State of New York with headquarters located at Reston, VA.

## STATEMENT OF FACTS

9. Mr. Hooks is a gay African-American man.

10. In or around July 2015, BridgeStreet hired Mr. Hooks as a Temporary Receptionist.

11. On February 8, 2016, BridgeStreet brought on Mr. Hooks permanently and promoted him to a full-time Guest Experience Coordinator.

12. Mr. Hooks' original responsibilities as a Guest Experience Coordinator included taking care of guests and responding to any complaints they had.

13. As Mr. Hooks excelled in his job, BridgeStreet started to increase and expand Mr. Hooks' job duties: BridgeStreet requested that Mr. Hooks start making site visits and corresponding with building management, leasing offices, and apartment owners.

14. BridgeStreet also put Mr. Hooks in charge of overseeing design and meeting with vendors.

15. Despite his success, Mr. Hooks often felt as though BridgeStreet treated him and other minority employees less well than its white employees.

16. For example, after Mr. Hooks called Human Resources to alert them to a spate of thefts in the office, BridgeStreet's investigation targeted the minorities in the office, including Mr. Hooks.

17. As a result, Bridgestreet's minority employees began avoiding certain theft target areas of the office, using other entrances and exits so that no one at Bridgestreet would accuse them of stealing. BridgeStreet's minority employees began expressing their discomfort with the situation.

18. Mr. Hooks, who at times had felt personally discriminated against by his white managers, asked his coworkers if they too had faced discrimination in the workplace.

19. After speaking to other employees, Mr. Hooks noticed that BridgeStreet's black employees were being paid less than their white colleagues.

20. Mr. Hooks also noticed that women were being paid less than the men in the office.

21. Mr. Hooks voiced these concerns to Human Resources, to no avail.

22. These problems escalated after August 2016, when BridgeStreet hired a new Manager, Cindy Hancock.

23. Mr. Hooks became embroiled in a dispute between Ms. Hancock and Ms. Ramzan, stemming from Ms. Ramzan's failure to provide Christmas tips from December 2015 to the staff of certain BridgeStreet properties after misplacing the funds.

24. On August 15, 2016, Mr. Hooks called Human Resources to report that Ms. Ramzan had lied about tipping BridgeStreet staff. However, Mr. Hooks never heard any response to his complaint.

25. In November 2016, President Trump's election created severe tension in the office.

26. The Reservationist, Daniela Vislocky, who is a white woman, wrote, "Congratulations President Trump!" on the board in the office.

27. Mr. Hooks explained, "That's probably not the best idea in an office full of brown people," to which Ms. Vislocky responded, "You had your time. It's our time now."

28. At this point, Craven Bryan, the New York Reservations Team Manager and Ms. Vislocky's immediate supervisor, began defending Ms. Vislocky, upsetting Mr. Hooks and the other minority employees in the office.

29. Mr. Hooks complained to Ms. Ramzan about this incident and Ms. Ramzan responded via email a week later, saying only, "no talking about politics" in the office.

30. Mr. Hooks responded to Ms. Ramzan's email, copying two other Managers, Johnny Rodriguez and Kevin Toomer, saying that BridgeStreet needed to revisit diversity training in the office to improve the BridgeStreet environment for their non-white employees.

31. Yet, once again, Mr. Hooks received no response to his email.

32. In June 2017, Ms. Ramzan went on vacation. During Ms. Ramzan's vacation, Mr. Hooks worked more closely with Mr. Bryan.

33. On June 28, 2017, a client called the office after Mr. Hooks returned from the field and notified Mr. Hooks that no one at the office had been answering the phones.

34. Mr. Bryan and Ms. Vislocky were at the office during this time, and it was their responsibility to answer phones and communicate with clients.

35. Mr. Hooks and other BridgeStreet employees had previously complained to Ms. Ramzan and other BridgeStreet Managers that Mr. Bryan and Ms. Vislocky were intentionally not answering phones, which was increasing the workload on Mr. Hooks and two other black staff members.

36. Mr. Hooks emailed Mr. Bryan, Ms. Vislocky, Ms. Hancock, and Ms. Ramzan, about the client's complaint.

37. Mr. Bryan responded, brushing off Mr. Hooks' email and claiming that he had not been negligent of the phones.

38. After receiving this email, Mr. Hooks went downstairs to address the issue with Mr. Bryan, who told Mr. Hooks that he couldn't speak because he was too busy.

39. When Mr. Bryan refused to speak with him, Mr. Hooks became raised the problem with Ms. Vislocky and told her "It's a fucking embarrassment. Answer your phones."

40. A few minutes later, after finding out about what Mr. Hooks had said, Mr. Bryan, who is white, aggressively charged up to Mr. Hooks, yelling, "You don't talk to Daniela like that!" while Mr. Hooks was seated at his desk.

41. Then, Mr. Bryan became even more aggressive with Mr. Hooks, slamming his hands on Mr. Hooks' desk and yelling: "Stand the fuck up. I'm a fucking manager."

42. Mr. Bryan then started throwing things at Mr. Hooks while he called Mr. Hooks a "pussy", "bitch", and said "I'll kill you" in front of several colleagues.

43. Mr. Hooks was concerned for his physical safety, and understood the language accompanying Mr. Bryan's threats – the terms "pussy" and "bitch" – were meant to demean and dehumanize him because of his sexual orientation.

44. At this point, another manager, Johnny Rodriguez, stepped between the two men and attempted to calm Mr. Bryan down.

45. Mr. Rodriguez was forced to drag Mr. Bryan away, as Mr. Bryan tried to push through him to attack Mr. Hooks.

46. Mr. Hooks immediately contacted Ms. Hancock after this incident to alert her to Mr. Bryan's threatening and homophobic comments.

47. Mr. Hooks, who had never concealed his sexual orientation at work, was deeply offended by Mr. Bryan's discriminatory comments.

48. During this talk, Ms. Hancock was empathetic towards Mr. Hooks and found Mr. Bryan's behavior unacceptable.

49. The next day, on June 29, 2017, Ms. Hancock interviewed everyone involved in the incident.

50. During this investigation, BridgeStreet reviewed the footage of Mr. Hooks' conversations with Ms. Vislocky and Mr. Bryan, which supported Mr. Hooks' version of events.

51. Mr. Hooks expressed that he was incredibly uncomfortable at the thought of having to interact with Mr. Bryan and did not want to come into work.

52. Ms. Hancock, however, assured him that Mr. Bryan would be working from home, and asked Mr. Hooks to come into work as usual.

53. On July 2, 2017, Mr. Hooks began going to therapy to cope with incident with Mr. Bryan.

54. On July 3, 2017, Mr. Hooks, concerned that BridgeStreet would try to sweep this incident under the rug, filed a police report.

55. BridgeStreet fired Mr. Bryan on July 13, 2017. Earlier that day Mr. Hooks met with Ms. Hancock and Walter ("J.R") Dambiec, the Managing Director of Operations and Brand Support Services.

56. They said that Mr. Hooks would be written up for cursing during the original incident and that it would go on Mr. Hooks' file.

57. On July 15, 2017, Human Resources wrote Mr. Hooks up for using profanity in the office.

58. On July 7, 2017, a week after the incident, Ms. Ramzan returned from her vacation. Upon her arrival, Ms. Ramzan immediately became hostile to Mr. Hooks, apparently blaming him for the termination of Mr. Bryan.

59. From this point on, she refused to talk to Mr. Hooks whenever possible.

60. When Mr. Hooks asked Ms. Ramzan if he could put his expenses for therapy on his timesheet or if he would need to file a workman's compensation claim, Ms. Ramzan only rolled her eyes in response and suggested he go to HR.

61. Mr. Hooks, discouraged by Ms. Ramzan's response and knowing that the Director of HR recently resigned, paid for his sessions out of his own pocket.

62. On October 3, 2017, Mr. Hooks was pulled into an office with Ms. Ramzan and Ryan Rosenberg, the Vice President of Operations, Supply Chain, and Quality Assurance.

63. During this impromptu meeting, BridgeStreet terminated Mr. Hooks' employment, although they assured Mr. Hooks that it had "nothing to do with performance" but was "due to company restructuring."

64.     However, Mr. Hooks was one of BridgeStreet's most valuable employees with an extensive list of job responsibilities. BridgeStreet was, in fact, realigning its business towards the areas in which Mr. Hooks worked.

65.     BridgeStreet, with its history of treating its minority employees less well than white employees in the terms and conditions of their employment, ultimately terminated him because of his race and because of his complaints of discriminatory conduct.

66.     In light of the above, BridgeStreet has violated Federal, State, and Local employment laws by discriminating against Mr. Hooks and retaliating against him for his complaints of discrimination.

67.     At the time of his termination, Mr. Hooks made approximately $50,000 a year.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Wrongful Termination in Violation of § 1981

68.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 66 with the same force as though separately alleged herein.

69.     Section 1981 prohibits discrimination in a contractual relationship, such as employment, on the basis of race.

70.     Defendant violated § 1981 by terminating Plaintiff's employment based on his race.

71.     As a direct and proximate consequence of Defendant's race discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

72.     Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of § 1981

73.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 72 with the same force as though separately alleged herein.

74.     Section 1981 prohibits an employer from retaliating against an employee for engaging in protected activity under § 1981.

75.     Plaintiff engaged in protected activity under § 1981 when he properly complained to Defendant about race discrimination and unequal pay prohibited under § 1981.

76.     Defendant retaliated against Plaintiff by, ultimately, terminating his position.

77.     As such, Defendant has violated § 1981.

78.     As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

## THIRD CAUSE OF ACTION
### Hostile Work Environment in Violation of NYCHRL

79.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 78 with the same force as though separately alleged herein.

80.     The NYCHRL prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of race and sexual orientation.

81. Defendant violated the NYCHRL when it subjected Plaintiff to a hostile work environment based on his race and sexual orientation, including subjecting him to offensive comments and slurs in the workplace.

82. As a direct and proximate consequence of Defendant's discriminatory conduct, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

83. Defendant's discriminatory treatment of Plaintiff involved a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## FOURTH CAUSE OF ACTION
### Wrongful Termination in Violation of NYCHRL

84. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 83 with the same force as though separately alleged herein.

85. The NYCHRL prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of race and sexual orientation.

86. Defendant violated the NYCHRL when it terminated Plaintiff's employment based on these protected characteristics.

87. As a direct and proximate consequence of Defendant's discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

88.     Defendant's discriminatory treatment of Plaintiff involved a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

### FIFTH CAUSE OF ACTION
### Retaliation in Violation of NYCHRL

89.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 88 with the same force as though separately alleged herein.

90.     The NYCHRL prohibits an employer from retaliating against an employee for engaging in protected activity under the NYCHRL.

91.     Plaintiff engaged in protected activity under the NYCHRL when he properly complained to Defendant about race and sexual orientation discrimination that is unlawful under the NYCHRL.

92.     Defendant retaliated against Plaintiff by, ultimately, terminating him.

93.     As such, Defendant has violated the NYCHRL.

94.     As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages to be determined at trial;

B. For the second cause of action, damages to be determined at trial;

C. For the third cause of action, damages to be determined at trial;

D. For the fourth cause of action, damages to be determined at trial;

E. For the fifth cause of action, damages to be determined at trial; and

F. For such other and further relief as the Court deems just and proper.

Dated: New York, New York
       June 15, 2018

By: _____
Walker G. Harman, Jr. [WH-8044]
Owen H. Laird [OL-6994]
THE HARMAN FIRM, LLP
381 Park Avenue South, Suite 1220
New York, NY 10001
(212) 425-2600
wharman@theharmanfirm.com
olaird@theharmanfirm.com

*Attorneys for Plaintiff*